T.C. Memo. 2001-325

UNITED STATES TAX COURT

JOHN A. ROWE AND DONNA L. ROWE, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 20890-93, 21346-94.      Filed December 28, 2001.

<u>Rodney S. Klein</u>, for petitioner Donna L. Rowe.

John A. Rowe, pro se.

<u>Stephen R. Takeuchi</u>, for respondent.

MEMORANDUM OPINION

RUWE, <u>Judge</u>:  Respondent determined deficiencies in
petitioners' Federal income taxes, additions to tax, and
penalties as follows:[1]

---

[1]The fraud additions to tax pursuant to sec. 6653(b) for the
taxable years 1987 and 1988, and the fraud penalty pursuant to
(continued...)

| | | Additions to Tax and Penalties | | |
|---|---|---|---|---|
| Year | Deficiency | Sec. 6653(b)(1)(A) | Sec. 6653(b)(1)(B) | Sec. 6661 |
| 1987 | $173,817 | $130,363 | [1] | $43,454 |

| | | Sec. 6653(b)(1) | | Sec. 6661 |
|---|---|---|---|---|
| 1988 | 53,937 | $40,453 | | $13,484 |

| | | Sec. 6651(a)(1) | | Sec. 6663 |
|---|---|---|---|---|
| 1989 | 73,279 | $13,792 | | $54,959 |

| | | Sec. 6654 | | Sec. 6662(c) |
|---|---|---|---|---|
| 1990 | 124,891 | $8,057 | | $24,978 |

[1]50 percent of the interest due on $173,817.

After concessions,[2] the primary issue for decision is whether petitioner Donna A. Rowe is entitled to relief from joint liability pursuant to section 6015[3] with respect to the following omitted income and erroneous deduction items giving rise to deficiencies: (1) Distribution proceeds from a retirement account in petitioner's name; (2) capital gain income from the sale of jointly titled property; (3) mortgage interest deductions on jointly titled property; (4) losses related to a farming activity; and (5) charitable contribution deductions. Additionally, we must decide whether petitioner Donna A. Rowe is

_____

[1](...continued)
sec. 6663 for the taxable year 1989, relate only to petitioner John A. Rowe.

[2]See appendix.

[3]References to sec. 6015 are to that section as added to the Internal Revenue Code by the Internal Revenue Service Restructuring and Reform Act of 1998, Pub. L. 105-206, sec. 3201, 112 Stat. 734. Unless otherwise indicated, all other section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

liable for any additions to tax or penalties. For purposes of clarity, after a brief general background and overview of applicable law, each of the issues submitted for our consideration is set forth below with separate background and discussion.

General Background

Some of the facts have been stipulated and are so found. The stipulation of facts, first supplemental stipulation of facts, stipulations of agreed issues, stipulation of settled issues, and the attached exhibits are incorporated herein by this reference. Petitioners, John A. Rowe (Mr. Rowe) and Donna L. Rowe (hereinafter petitioner), resided in Florida at the time they filed their petitions.

Mr. Rowe graduated from the University of Tennessee in 1969 with a degree in dental science. Thereafter, he attended the University of Tennessee Dental School and received a degree in dental surgery in 1972 and a degree in oral surgery in 1975. Petitioner graduated from the University of Tennessee in 1971 with a degree qualifying her as a registered dental hygienist. Petitioners were married in Kingsport, Tennessee, on June 27, 1971, and they had two children during their marriage, Christopher and Elizabeth.

From 1971 to 1977, petitioners lived in Memphis, Tennessee, where Mr. Rowe conducted an oral surgery practice. From 1977 to

1982, petitioners lived in Bristol, Tennessee, where Mr. Rowe also conducted an oral surgery practice. In 1981, Mr. Rowe became licensed to practice oral surgery in the State of Florida. In 1982, Mr. Rowe was suspended by the Board of Dentistry in Tennessee and, as a result, Mr. Rowe stopped practicing dentistry in Tennessee. In 1983, petitioners moved to Madisonville, Kentucky, where Mr. Rowe worked in a dental clinic. In late 1984, petitioners moved from Kentucky to Osceola County, Florida, where they resided during the years in issue.

From October 1984 through October 1989, Mr. Rowe was employed as a dentist and oral surgeon by the Central Florida Dental Association (CFDA) in Kissimmee, Florida, and St. Cloud, Florida. Mr. Rowe's annual salary while at the CFDA was approximately $240,000, and he also shared in the profits of the business. Dr. Frank Murray (Dr. Murray) was the president of the CFDA during the years in issue. In 1989, Dr. Murray suspected that Mr. Rowe was improperly handling payments from clients and insurance companies. Mr. Rowe's employment with the CFDA was subsequently terminated. The local prosecuting attorney was informed of Dr. Murray's suspicions regarding the improper handling of payments, and Mr. Rowe was investigated and eventually arrested for embezzling funds. Mr. Rowe was indicted on charges of grand theft and computer fraud; however, the

charges were dropped because of insufficient evidence of criminal intent.

After his employment with the CFDA ended, Mr. Rowe started his own dental practice, and he also provided dental services through another business.  In April 1995, Mr. Rowe was convicted of Federal money laundering.  He was sentenced to 33 months in prison and ordered to make restitution of $359,452.17 to the Bank of New York.  In November 1997, Mr. Rowe pleaded guilty to 51 counts of unlawful compensation under Florida State Medicaid laws and one count of organized fraud.  He was sentenced to 8 months in prison and ordered to make restitution of $5,051.45 to the Department of Health and Human Services.  The 1997 conviction stemmed from unlawful acts performed by Mr. Rowe in connection with providing dental services.

During her marriage to Mr. Rowe, petitioner was primarily a housewife.  She engaged in occasional work as a substitute teacher, did some office filing, and volunteered at church. Petitioner's personal income during the years in issue was minimal.  Petitioner has no background in accounting, tax, or other financial matters.  During the years in issue, petitioner did not have expensive jewelry, drive a luxurious car, or wear designer clothes.  Petitioners' primary residence during the years in issue was sparsely furnished with old office furniture

from Mr. Rowe's business, and the walls were decorated with arts and crafts which were handmade by petitioner.

While petitioner was primarily responsible for the household duties, Mr. Rowe controlled all aspects of petitioners' financial matters. Mr. Rowe regularly prepared petitioners' joint tax returns, occasionally with the assistance of other individuals.[4]

During the years in issue, petitioners maintained a joint checking account (NCNB account) at NCNB National Bank. Deposits totaling approximately $624,286, $383,557, $26,176, and $7,086,[5] respectively, were made into the NCNB account in 1987, 1988, 1989, and 1990. Mr. Rowe deposited money into the NCNB account at irregular intervals and in amounts necessary to cover household expenses. Petitioner and Mr. Rowe both wrote checks on the NCNB account. The majority of the amount paid by checks from the NCNB account in 1987 and 1988 was related to the purchase of property and the construction of a residence thereon, and the checks were written by or at the direction of Mr. Rowe.

Mr. Rowe also maintained separate bank accounts which petitioner was unaware existed. Petitioner did not have access

_____

[4]Richard Danley (Mr. Danley), an accountant, assisted Mr. Rowe in preparing petitioners' 1990 Federal income tax return.

[5]Approximately $4,102 of the deposit total for 1990 represented petitioner's earnings from her employment as a substitute teacher.

to Mr. Rowe's separate accounts, and he did not provide her with information regarding these accounts.  Mr. Rowe opened accounts in petitioner's name without her knowledge and also signed petitioner's name on several occasions without her knowledge.

Petitioner and Mr. Rowe's divorce was finalized in June 1996.  The Final Judgment for Dissolution of Marriage between petitioner and Mr. Rowe states that petitioner's "standard of living and financial circumstances have been devastated by * * * [Mr. Rowe's] wrong-doing and incarceration."  The final judgment also notes that petitioner "does not have the present financial resources to support herself and * * * [petitioners' daughter, Elizabeth] adequately, but that * * * [Mr. Rowe] does not have the present ability to pay alimony."  As a result of Mr. Rowe's criminal activities, petitioner had to move out of the family's residence in Florida and back to Kingsport, Tennessee, to live with her parents.  At the time of trial, petitioner was employed full time as a dental hygienist, and she was paid by commission only.

For the taxable years 1987, 1988, 1989, and 1990, petitioners filed joint Federal income tax returns which were received by respondent on October 19, 1988, October 17, 1989, July 31, 1991, and October 18, 1991, respectively.  On June 25, 1993, respondent issued a notice of deficiency to petitioners for their taxable years 1987, 1988, and 1989.  On August 18, 1994,

respondent issued a notice of deficiency to petitioners for their taxable year 1990.  Petitioners timely filed petitions seeking redeterminations.  Petitioners subsequently moved to have their cases consolidated, and we ordered the cases consolidated for trial, briefing, and opinion.

Petitioner subsequently made valid elections for relief under section 6015(b), (c), and (f).  Respondent granted petitioner relief from joint liability with respect to some of the items giving rise to deficiencies; however, respondent denied relief with respect to other items.

Overview of Applicable Law

If a joint return is filed, the liability with respect to the tax is normally joint and several.  Sec. 6013(d)(3).  In 1971, Congress enacted section 6013(e) to correct perceived inequities resulting from the imposition of joint and several liability in certain circumstances.  S. Rept. 91-1537, at 2 (1970), 1971-1 C.B. 606, 607.  As amended,[6] section 6013(e) provided that a spouse could be relieved of tax liability if the spouse proved:  (1) A joint return was filed; (2) the return contained a substantial understatement of tax attributable to

---

[6]Sec. 6013(e) initially provided relief only in cases involving an omission of income.  The scope of sec. 6013(e) was expanded in 1984 to provide relief in cases involving erroneous deductions.  Deficit Reduction Act of 1984, Pub. L. 98-369, sec. 424, 98 Stat. 494, 801-803; H. Conf. Rept. 98-861, at 1119 (1984), 1984-3 C.B. (Vol. 2) 1, 373.

grossly erroneous items of the other spouse; (3) in signing the return, the spouse seeking relief did not know, and had no reason to know, of the substantial understatement; and (4) under the circumstances it would be inequitable to hold the spouse seeking relief liable for the substantial understatement.

Relief under section 6013(e) was difficult for many taxpayers to obtain. In 1998, Congress repealed section 6013(e) and enacted section 6015 in order to make relief from joint liability more accessible. Internal Revenue Service Restructuring and Reform Act of 1998, Pub. L. 105-206, sec. 3201(a), 112 Stat. 734; H. Conf. Rept. 105-599, at 249 (1998), 1998-3 C.B. 747, 1003. Section 6015 provides three avenues of relief from joint and several liability: (1) Section 6015(b)(1) (which is similar to former section 6013(e)) allows a spouse to escape joint and several liability; (2) section 6015(b)(2) and (c) allows a spouse to be relieved from a portion of the understatement or deficiency; and (3) section 6015(f) confers upon the Secretary discretion to grant equitable relief in situations where relief is unavailable under section 6015(b) or (c). Section 6015 generally applies to any liability for tax arising after July 22, 1998, and any liability for tax arising on or before July 22, 1998, that remains unpaid as of such date. H. Conf. Rept. 105-599, supra at 251, 1998-3 C.B. at 1005.

A spouse seeking relief from joint liability is not limited to seeking relief under only one subsection; rather, the spouse may make simultaneous claims for relief under all provisions.  In the instant case, the parties have treated petitioner's claim for relief from joint liability as elections pursuant to section 6015(b), (c), and (f).

A.    Section 6015(b)

Section 6015(b) provides, in pertinent part:

>       SEC. 6015(b).  Procedures for Relief From
> Liability Applicable to All Joint Filers.--
>
>           (1)  In general.--Under procedures prescribed
>       by the Secretary, if--
>
>               (A)  a joint return has been made for a
>           taxable year;
>
>               (B)  on such return there is an
>           understatement of tax attributable to
>           erroneous items of 1 individual filing the
>           joint return;
>
>               (C)  the other individual filing the
>           joint return establishes that in signing the
>           return he or she did not know, and had no
>           reason to know, that there was such
>           understatement;
>
>               (D)  taking into account all the facts
>           and circumstances, it is inequitable to hold
>           the other individual liable for the
>           deficiency in tax for such taxable year
>           attributable to such understatement; and
>
>               (E)  the other individual elects (in
>           such form as the Secretary may prescribe) the
>           benefits of this subsection not later than
>           the date which is 2 years after the date the
>           Secretary has begun collection activities

with respect to the individual making the election,

then the other individual shall be relieved of liability for tax (including interest, penalties, and other amounts) for such taxable year to the extent such liability is attributable to such understatement.

(2) Apportionment of relief.--If an individual who, but for paragraph (1)(C), would be relieved of liability under paragraph (1) establishes that in signing the return such individual did not know, and had no reason to know, the extent of such understatement, then such individual shall be relieved of liability for tax (including interest, penalties, and other amounts) for such taxable year to the extent that such liability is attributable to the portion of such understatement of which such individual did not know and had no reason to know.

Section 6015(b)(1) is similar to former section 6013(e)(1). We may look at cases interpreting former section 6013(e)(1) for guidance when analyzing section 6015(b)(1). Butler v. Commissioner, 114 T.C. 276, 283 (2000); Braden v. Commissioner, T.C. Memo. 2001-69.

B. Section 6015(c)

Section 6015(c) provides relief from joint liability for spouses either no longer married, legally separated, or living apart. Generally, this avenue of relief allows a spouse to elect to be treated, for purposes of determining tax liability, as if separate returns had been filed. Section 6015(c) provides, in pertinent part:

SEC. 6015(c). Procedures to Limit Liability for Taxpayers No Longer Married or Taxpayers Legally Separated or Not Living Together.--

(1) In general.--Except as provided in this subsection, if an individual who has made a joint return for any taxable year elects the application of this subsection, the individual's liability for any deficiency which is assessed with respect to the return shall not exceed the portion of such deficiency properly allocable to the individual under subsection (d).

(2) Burden of proof.--Except as provided in subparagraph (A)(ii) or (C) of paragraph (3), each individual who elects the application of this subsection shall have the burden of proof with respect to establishing the portion of any deficiency allocable to such individual.

(3) Election.--

*     *     *     *     *     *     *

(C) Election not valid with respect to certain deficiencies.--If the Secretary demonstrates that an individual making an election under this subsection had actual knowledge, at the time such individual signed the return, of any item giving rise to a deficiency (or portion thereof) which is not allocable to such individual under subsection (d), such election shall not apply to such deficiency (or portion). * * *

1.  Allocation of Items

In enacting section 6015, Congress intended that the election for relief from joint liability "be available to limit the liability of spouses for tax attributable to items of which they had no knowledge." S. Rept. 105-174, at 55 (1998), 1998-3 C.B. 537, 591. Generally, an item giving rise to a deficiency on a joint return is allocated between the electing spouse and

former spouse in the same manner as it would have been allocated if they had filed separate returns for the taxable year.[7]  Sec. 6015(d)(3)(A); <u>Grossman v. Commissioner</u>, 182 F.3d 275, 278 (4th Cir. 1999), affg. T.C. Memo. 1996-452; <u>Charlton v. Commissioner</u>, 114 T.C. 333, 342 (2000); see also S. Rept. 105-174, <u>supra</u> at 56, 1998-3 C.B. at 592; H. Conf. Rept. 105-599, <u>supra</u> at 250, 1998-3 C.B. at 1004.  The electing spouse has the burden of proof with respect to establishing the portion of any deficiency allocable to the electing spouse.  Sec. 6015(c)(2).  The allocation is made without regard to community property laws.  Sec. 6015(a) (flush language); <u>Charlton v. Commissioner</u>, T.C. Memo. 2001-76.  The statute provides two exceptions to the general rule of section 6015(d)(3)(A).  Section 6015(d)(3)(B) provides that an item otherwise allocable to one spouse under section 6015(d)(3)(A)

---

[7]Sec. 6015(d) provides, in pertinent part:

>    SEC. 6015(d).  Allocation of Deficiency.--For purposes of * * * [section 6015(c)]--

>              *      *      *      *      *      *      *

>    (3) Allocation of Items Giving Rise to the Deficiency.-For purposes of * * * [section 6015(c)]-

>         (A) In general.--Except as provided in paragraphs (4) and (5), any item giving rise to a deficiency on a joint return shall be allocated to individuals filing the return in the same manner as it would have been allocated if the individuals had filed separate returns for the taxable year.

shall be allocated to the other spouse filing the joint return to the extent the item gave rise to a tax benefit on the joint return to the other spouse. Section 6015(d)(3)(C) permits the Secretary to allocate items other than in the manner described in 6015(d)(3)(A) if the Secretary establishes that such allocation is appropriate due to fraud of one or both spouses.

Congress has authorized the Secretary to prescribe regulations providing methods of allocation other than the methods provided in section 6015(d)(3). Sec. 6015(g)(1); see also S. Rept. 105-174, supra at 56-57, 1998-3 C.B. at 592-593; H. Conf. Rept. 105-599, supra at 251, 1998-3 C.B. at 1005. Congress provided the following guidance regarding the types of alternative methods of allocating items between spouses:

> Under the bill, allocation of items of income and deduction follows the present-law rules determining which spouse is responsible for reporting an item when the spouses use the married, filing separate filing status. The Secretary of the Treasury is granted authority to prescribe regulations providing simplified methods of allocating items.
>
> In general, apportionment of items of income are expected to follow the source of the income. Wage income is allocated to the spouse performing the job and receiving the Form W-2. Business and investment income (including any capital gains) is allocated in the same proportion as the ownership of the business or investment that produces the income. Where ownership of the business or investment is held by both spouses as joint tenants, it is expected that any income is allocated equally to each spouse, in the absence of clear and convincing evidence supporting a different allocation.
>
> The allocation of business deductions is expected to follow the ownership of the business. Personal deduction items are expected to be allocated equally

between spouses, unless the evidence shows that a different allocation is appropriate. For example, a charitable contribution normally would be allocated equally to both spouses. However, if the wife provides evidence that the deduction relates to the contribution of an asset that was the sole property of the husband, any deficiency assessed because it is later determined that the value of the property was overstated would be allocated to the husband.

Items of loss or deduction are allocated to a spouse only to the extent that income attributable to the spouse was offset by the deduction or loss. Any remainder is allocated to the other spouse.

Income tax withholding is allocated to the spouse from whose paycheck the tax was withheld. Estimated tax payments are generally expected to be allocated to the spouse who made the payments. If the payments were made jointly, the payments are expected to be allocated equally to each spouse, in the absence of evidence supporting a different allocation.

The allocation of items is to be made without regard to the community property laws of any jurisdiction.

If the electing spouse establishes that he or she did not know, and had no reason to know, of an item and, considering all the facts and circumstances, it is inequitable to hold the electing spouse responsible for any unpaid tax or deficiency attributable to such item, the item may be equitably reallocated to the other spouse. In cases where the IRS proves fraud, the IRS may distribute, apportion, or allocate any item between spouses. [S. Rept. 105-174, supra at 56-57, 1998-3 C.B. at 592-593.]

On January 17, 2001, the Secretary issued proposed

regulations under section 6015.[8]  Sec. 1.6015-1, Proposed Income

---

[8]On Mar. 29, 2001, minor corrections were made to the proposed regulations. Sec. 1.6015-1, Proposed Income Tax Regs., 66 Fed. Reg. 17130 (Mar. 29, 2001). The proposed regulations provide that erroneous items are generally allocated between spouses as if separate returns are filed, subject to four exceptions. Sec. 1.6015-3(d)(2), Proposed Income Tax Regs., 66 Fed. Reg. 3888, 3898 (Jan. 17, 2001). The exceptions cover situations where: (1) One spouse receives a tax benefit on the

(continued...)

Tax Regs., 66 Fed. Reg. 3888 (Jan. 17, 2001).  To date, no final regulations have been issued.

### 2.   Actual Knowledge

If the Commissioner demonstrates that an individual making the election under section 6015(c) had "actual knowledge", at the time such individual signed the return, of any item giving rise to a deficiency (or portion thereof) which is not allocable to such individual under section 6015(d), the election under section 6015(c) will not apply to such deficiency (or portion).  Sec. 6015(c)(3)(C).  In the context of omitted income, the Commissioner must show that the electing spouse had an "actual and clear awareness of the omitted income."  Cheshire v. Commissioner, 115 T.C. 183, 195 (2000).  In the context of a disallowed deduction, the Commissioner must show that the electing spouse had "actual knowledge of the factual circumstances which made the item unallowable as a deduction." King v. Commissioner, 116 T.C. 198, 204 (2001).  In either context, actual knowledge on the part of the electing spouse as

---

[8](...continued)
joint return, (2) one or both spouses commit fraud, (3) erroneous items of income are present, and (4) erroneous deduction items are present.  Sec. 1.6015-3(d)(2)(i)-(iv), Proposed Income Tax Regs., supra.  With respect to situations involving omitted income and erroneous deduction items, the proposed regulations provide language similar to that contained in the legislative history.  Sec. 1.6015-3(d)(2)(iii), (iv), Proposed Income Tax Regs., supra.  The proposed regulations omit Congress's reference to the equitable reallocation of an item where the electing spouse did not know, or have reason to know, of an item.

to the tax laws or legal consequences of the operative facts is not required.  King v. Commissioner, supra, at 204; Cheshire v. Commissioner, supra, at 195.

C.   Section 6015(f)

Section 6015(f) permits the Secretary to relieve a spouse of liability if, taking into account all the facts and circumstances, it is inequitable to hold the spouse liable for any unpaid tax or deficiency (or any portion of either) and relief is not otherwise available under section 6015(b) or (c). Sec. 6015(f); Cheshire v. Commissioner, supra at 197. Respondent's denial of equitable relief is reviewed under an abuse of discretion standard.  Cheshire v. Commissioner, supra at 198; Butler v. Commissioner, 114 T.C. at 292.  This is a question of fact.  Cheshire v. Commissioner, supra.

On the basis of the circumstances of this case, we initially consider the merits of petitioner's claims for relief with respect to income and deduction items under section 6015(c).  The parties agree that petitioner made a valid election under section 6015(c), she was no longer married to Mr. Rowe at the time of the election, and petitioner and Mr. Rowe filed joint returns for the years in issue.  To the extent petitioner fails to qualify for relief under subsection (c), we address her claim for relief under section 6015(b).  To the extent petitioner fails to qualify for relief under section 6015(b) or (c), we address her claim for

equitable relief under section 6015(f).  Finally, we address whether petitioner is liable for any additions to tax or penalties for the years in issue.

I.   Retirement Account Distributions

     A.   Background

In 1990, lump-sum distributions were made from various pension, profit sharing, and retirement accounts bearing the name of either petitioner or Mr. Rowe.  The taxable amount distributed from the accounts in Mr. Rowe's name totaled $112,979.  The taxable amount distributed from an individual retirement account (IRA) in petitioner's name totaled $3,426.  These amounts were not reported on petitioners' 1990 Federal income tax return. Respondent concedes that petitioner is entitled to be relieved from joint liabilities attributable to the amount distributed from Mr. Rowe's accounts.

     B.   Discussion

          1.   Allocation of Item

Petitioner argues that the distributions from the IRA in her name are allocable to Mr. Rowe because he concealed the account from petitioner and she was not aware of the account or the distributions until after she signed the return for the year in issue.  Respondent contends that the distributions from the IRA are allocable to petitioner because the account was in her name and she received the distributions.

In analyzing relief from joint liability under section 6015(c), items are generally allocated as if petitioner and Mr. Rowe had filed separate returns.  Sec. 6015(d)(3)(A).  The first principle of income taxation is that income must be taxed to him who earns it.  Commissioner v. Culbertson, 337 U.S. 733, 739-740 (1949); Schuster v. Commissioner, 84 T.C. 764, 773 (1985), affd. 800 F.2d 672 (7th Cir. 1986).  Married individuals filing separate returns are required to report their own income. Charlton v. Commissioner, T.C. Memo. 2001-76.

Petitioner testified that before 1995 she was not aware of any retirement accounts or plans established in her name.  She could not recall signing any papers to open a retirement account, authorizing withdrawals, signing distribution checks, or receiving any funds from a retirement account.  Mr. Rowe testified that he personally established the retirement account and that he could have opened it in petitioner's name without her knowledge.  Mr. Rowe also testified that he believed funds were borrowed from the account, but that he did not consult petitioner regarding the loan.  Mr. Rowe further testified that he provided no information to petitioner regarding retirement planning.

The process of distilling truth from falsehood from the testimony of witnesses, whose demeanor and credibility we observe, is the daily grist of judicial life.  Diaz v. Commissioner, 58 T.C. 560, 564 (1972).  After watching petitioner

at trial and observing her demeanor, we found her to be a
credible and earnest witness, and we are satisfied that her
testimony was truthful.  Additionally, Mr. Rowe's testimony was
consistent with petitioner's claim that she was not aware of the
IRA or the distributions before 1995.  The evidence in the record
indicates that Mr. Rowe opened the IRA in petitioner's name and
concealed the account and the distributions from her.
Consequently, petitioner's only apparent connection to the IRA
was that her name was listed as the owner of the account.

In the instant case, this item is allocable to Mr. Rowe, and
petitioner will be entitled to relief from joint liability under
section 6015(c), unless respondent shows that she had actual
knowledge of this item.[9]  We note Congress's desire regarding
allocation in certain situations:

> If the electing spouse establishes that he or she
> did not know, and had no reason to know, of an item
> and, considering all the facts and circumstances, it is
> inequitable to hold the electing spouse responsible for
> any unpaid tax or deficiency attributable to such item,
> the item may be equitably reallocated to the other
> spouse. * * *  [S. Rept. 105-174, supra at 57, 1998-3
> C.B. at 593.]

---

[9]On the basis of Mr. Rowe's control and concealment of the
retirement account and the distributions, it appears that Mr.
Rowe, not petitioner, would have been required to report this
item if he had filed a separate return.  See, e.g., James v.
United States, 366 U.S. 213, 219 (1961) (holding that embezzled
funds must be included in the embezzler's gross income for
Federal income tax purposes in the year in which they were
misappropriated); Yerkie v. Commissioner, 67 T.C. 388, 390 (1976)
(same).

In our opinion, the extreme facts and circumstances presented represent just such a situation envisioned by Congress.

### 2. Actual Knowledge

Respondent argues that even if this item were allocable to Mr. Rowe, petitioner still had actual knowledge and reason to know of the item because she testified that she sorted the mail and opened letters addressed to her. Respondent claims that petitioner must have known about the IRA because periodic statements from the financial institution managing the account were addressed to her individually at her home address.

As we mentioned earlier, petitioner credibly testified that before 1995 she was not aware of the existence of any retirement accounts or plans in her name. Petitioner testified that she usually collected the mail, but that she never saw any letters notifying her of the existence of the IRA or the distributions. Mr. Rowe testified that sometimes he picked up the mail, and petitioners' son, Christopher, testified that whoever got home first would pick up the mail. Additionally, Mr. Rowe testified that he provided petitioner with no information regarding retirement planning. Whether petitioner had an actual and clear awareness of the omitted income is an essential fact respondent is required to establish under section 6015(c)(3)(C). Respondent has failed to establish this fact. Accordingly, we hold that

petitioner is entitled to relief from joint liability under section 6015(c) with respect to this item.

II.  Capital Gain from the Sale of Real Property

A.  Background

From late 1984 until May 1987, petitioners lived in Osceola County, Florida, and resided at certain property known as Lots 22 and 27.  Petitioners eventually purchased Lots 22 and 27 and the property was titled jointly in their names.

On May 11, 1987, petitioners sold lots 22 and 27 to Harry and Shelby Justice for a total sale price of $367,900. Petitioners' basis in the property at the time of the sale was $310,000, and the commission paid on the sale was $25,753.  The gain on the sale was $32,147.  In connection with the sale, a check for $89,210.53 representing the proceeds of the sale was issued payable to "John A. & Donna L. Rowe".  Petitioner signed the settlement statement for the property and endorsed the check.[10]  The check was deposited into petitioners' NCNB account on May 11, 1987.  Petitioners' 1987 Federal income tax return listed a capital gain of $30,159.  The capital gain reported on the return did not include any portion of the $32,147 gain from the sale of Lots 22 and 27.

_____

[10]Petitioner's name is signed "Donna L. Rowe" on the settlement statement and the check.

In 1987, certain real property (Anorada property) was purchased in the names of petitioner and Mr. Rowe.[11]  On September 30, 1988, the Anorada property was sold to Mohamed and Nabila Mohamed for a total sale price of $25,000.  Before the sale, the property was titled jointly in the names of petitioner and Mr. Rowe.  The basis in the Anorada property at the time of the sale to the Mohameds was $20,000, and the commission paid on the sale was $2,500.  The gain on the sale was $2,500.  In connection with the sale, a check for $13,552.31 representing the sale proceeds was issued payable to "John Rowe and Donna Rowe".  Petitioner's name is signed on both the settlement statement and the check.[12]  The check was deposited into petitioners' NCNB account on September 30, 1988.  Petitioners' 1988 return listed a capital gain of $20,695.  The capital gain reported on the return did not include the $2,500 gain from the sale of the Anorada property.

B.    Discussion

    1.    Allocation of Items

Petitioner argues that Mr. Rowe's secretive nature regarding his personal and financial activities supports allocating these

[11]Copies of a deed and a settlement statement list petitioner and Mr. Rowe as the purchasers of the Anorada property; however, neither petitioner's nor Mr. Rowe's signature appears on the copies of the documents.

[12]Petitioner's name is signed "Donna Rowe" on the settlement statement and check.

items to him because petitioner did not know, or have any reason to know, that the gains were not reported on the 1987 and 1988 tax returns. Respondent contends that the capital gain income is allocable evenly between petitioner and Mr. Rowe because the properties were jointly titled, and petitioner would have been required to report half of the proceeds from the sales had she filed separate returns.

Petitioner claims that she was often required to sign documents by Mr. Rowe under conditions where she was not allowed to question the contents of the documents. Petitioner maintains that Mr. Rowe did not tell her that she was listed as an owner of assets on any of the documents she signed. Petitioner acknowledges on brief that she and Mr. Rowe purchased properties; however, she claims that she was unaware of the disposition of many of the properties. Petitioner has not specifically asserted that she unknowingly signed documents related to the Anorada property or that she was unaware that her name was listed as a joint owner of the property.

Lots 22 and 27 and the Anorada property were titled jointly in the names of petitioner and Mr. Rowe. Petitioner testified that she was aware that she was listed as joint owner of Lots 22 and 27, and she remembered the approximate purchase price of the property. Petitioner's testimony also reflected that she was

aware that loans were obtained to finance the purchase of the property.

The evidence in the record reflects that petitioner knew that Lots 22 and 27 and the Anorada property were purchased, and she knew that she was listed as a joint owner of the property. Petitioner has failed to establish that the items should be allocated in a manner other than in proportion to petitioner's and Mr. Rowe's respective ownership interests. Accordingly, these items are allocable evenly between petitioner and Mr. Rowe. Therefore, to the extent petitioner lacked actual knowledge of these items, she will qualify for relief from joint liability under section 6015(c) for the portion of the item allocable to Mr. Rowe.[13]

### 2. Actual Knowledge

Respondent maintains that petitioner had actual knowledge of the capital gain income from the sales of Lots 22 and 27 and the Anorada property because petitioner was a co-owner of the properties, she signed the settlement statements, and she endorsed the settlement checks. Petitioner claims that she was unaware of any gain on the sale of Lots 22 and 27 because she did not have access to financial records, and she relied on Mr.

---

[13]Because petitioner cannot qualify for relief under sec. 6015(c) for the portions of items which are allocable to her, we analyze her ability to qualify for relief for such portions in our later discussion under sec. 6015(b) and (f). See infra pp. 53-61.

Rowe's determination that there was no gain.  Additionally, petitioner contends that she was unaware that the Anorada property was sold in 1988 and that it should have been reported on the 1988 return.

In Charlton v. Commissioner, 114 T.C. 333 (2000), we found that although the electing spouse had actual knowledge of income from a particular source and knew generally of the source of the income, he had no knowledge that all income from that source had not been accounted for as reported.  Thus, we held that the electing spouse qualified for relief under section 6015(c) because "respondent has not shown that Charlton had actual knowledge of the item causing the deficiency".  Id. at 341.  A few months later, in Cheshire v. Commissioner, 115 T.C. 183 (2000), we held that where the spouse claiming relief under section 6015(c) had actual knowledge of the omitted income but did not have knowledge "whether the entry on the return is or is not correct", relief was not available.  Id. at 195.  In Martin v. Commissioner, T.C. Memo. 2000-346, we discussed generally our decisions in Charlton v. Commissioner, supra, and Cheshire v. Commissioner, supra.  We concluded that actual knowledge of a disputed item of income and the amount thereof prevents a taxpayer from claiming relief from joint liability under section 6015(c).  Id.  We noted that where an electing spouse has actual knowledge of an income source, but no knowledge of the amount of

the financial gain, the electing spouse may still qualify for relief under section 6015(c).  Id.  With those principles in mind, we now consider whether petitioner had actual knowledge of the omitted capital gains income.

### i.  Lots 22 and 27

With respect to Lots 22 and 27, petitioner testified that she was aware that the property was sold to Harry and Shelby Justice in 1987.  Petitioner signed the settlement statement for the property and endorsed the check representing the proceeds from the sale.  However, the evidence in the record supports petitioner's claim that she did not know the actual amount of gain on the sale.  Petitioner testified that she simply signed loan and deed documents and nobody explained them to her.  She testified she did not see any type of financial statements at the closing of any real estate, and she did not have access to any statements or documents identifying the amount of interest paid on any mortgages.[14]

The testimony of petitioner and Mr. Rowe reflects that when petitioners filed their Federal income tax returns for the years in issue, petitioner was given the first two pages only of the tax returns when signing the returns, and she was not afforded the opportunity to see or review any attachments, schedules, or

---

[14]We note that the settlement statement does not identify petitioners' basis in the property at the time of sale.

- 28 -

other documents pertaining to the returns.  Petitioner testified that Mr. Rowe assured her he had records for petitioners' tax returns.  Petitioner claims that she was unaware of any gain from the sale of real estate and that she believed that all income, capital gains or otherwise, was included on petitioners' tax returns.[15]

Petitioner has admitted that she knew Lots 22 and 27 were sold in 1987.  However, respondent has not proven that petitioner knew the amount of the gain on the sale, or even that any gain was made on the sale.  Therefore, respondent has failed to establish that petitioner had actual knowledge of this item giving rise to a deficiency.  Accordingly, we hold that petitioner is entitled to relief from joint liability under section 6015(c) for the portion of this item allocable to Mr. Rowe.

ii.  Anorada Property

Petitioner maintains that she was unaware that the Anorada property was sold in 1988.  In connection with the sale of the Anorada property, a settlement check dated September 30, 1988, for $13,552.31 was written payable to "John Rowe and Donna Rowe".  Petitioner claims that she did not endorse the settlement check because the signature does not look like hers and because she

[15]We note that the first page of the 1987 return lists a capital gain of $30,159, which is almost the same amount of gain realized on the sale of Lots 22 and 27.

signs her name "Donna L. Rowe", not "Donna Rowe". Mr. Rowe testified that he signed petitioner's name on different documents, and he supposed he might have done so on a settlement statement. Although Mr. Rowe initially testified that he did not sign petitioner's name on the settlement statement or the check for the Anorada property, he then testified that "there's no telling what I might have done."

Petitioner's testimony that she was unaware of the sale of the Anorada property was credible and persuasive. Mr. Rowe's testimony regarding whether he signed petitioner's name on the settlement statement and check was unclear. Indeed, Mr. Rowe admitted that he had signed petitioner's name in the past without her knowledge and that he generally did not provide her with information regarding real estate transactions. Overall, we find that respondent has not satisfied his burden of proving that petitioner had actual knowledge of this item giving rise to a deficiency. Accordingly, we hold that petitioner is entitled to relief from joint liability under section 6015(c) for the portion of this item allocable to Mr. Rowe.

III. Mortgage Interest

    A. Background

    In May 1987, petitioners sold Lots 22 and 27 and purchased two adjoining 5-acre lots (Albritton property) across the street from Lots 22 and 27. One lot was fenced and on it were a horse

barn, a maintenance shed, and a larger building.  A sign on the road indicated that the lot was the Lake Gentry Horse Farm.  On the adjoining lot, petitioners constructed a new residence.  From May 1987 until late 1988, petitioners temporarily resided at property known as Acorn Court while their new home was being constructed. In the summer of 1988, petitioners moved into their new residence.  The total cost for the Albritton property and the new residence exceeded $1 million.  The residence was jointly titled in the names of petitioner and Mr. Rowe.

On the Schedule A, Itemized Deductions, attached to their 1987 return, petitioners claimed a home mortgage interest deduction of $62,545.  Petitioners substantiated $50,376 of this amount.  Respondent disallowed the remaining $12,169 of the claimed deduction on the basis of a lack of substantiation.

On the Schedule A attached to their 1988 return, petitioners claimed a home mortgage interest deduction of $97,341.  On the attached Schedule A, the notation "84,186 + 13,155" appears next to the figure $97,341.  The Schedule E, Supplemental Income Schedule, attached to the return lists $13,155 as mortgage interest paid on rental property identified as "Bayview House".  Petitioners substantiated $84,186 of the amount claimed for the home mortgage interest deduction.  The remaining $13,155 of the home mortgage interest deduction was

disallowed by respondent because it was a duplicate deduction of interest paid on the Bayview House.[16]

On the Schedule A attached to their 1990 return, petitioners' claimed a home mortgage interest deduction of $122,526.  Additionally, an interest expense of $60,564 was listed on the Schedule F, Farm Income and Expenses, attached to the return.  In the notice of deficiency for 1990, respondent allowed a mortgage interest deduction of $66,105 and disallowed the remaining $56,421 claimed on the Schedule A.  The notice of deficiency provided the following explanation:

> (h)(I)  It is determined that the Schedule A Itemized Deductions claimed on the 1990 return for Interest Expense is only allowable to the extent of $66,105.00.  Since you claimed $122,526.00, your taxable income is increased in the amount of $56,421.00 as shown below:

---

[16]In the notice of deficiency for the years 1987, 1988, and 1989, respondent provided the following explanation:

1.f.II.   It is determined that $13,155 of home mortgage interest expense claimed on Schedule A in the 1988 tax year is disallowed because this amount relates to one of your rental properties and has already been deducted on Schedule E.  Thus, this mortgage interest must be disallowed from Schedule A to prevent it from being deducted twice.

Accordingly, your taxable income for the 1988 tax year is increased by $13,155.

Substantiated Interest Expense

| | |
|---|---:|
| Household Finance | $69,770 |
| Farmers Bank and Trust | 9,671 |
| Home Savings of America | 11,417 |
| Central Fidelity | 7,922 |
| Allowable Interest Expense | 98,780 |
| Factor (33.1% for Schedule F & 66.9% for Schedule A) | x .669 |
| Allowable Schedule A Itemized Deduction | [1]66,105 |
| Claimed on the 1990 Tax Return | 122,526 |
| Increase in Taxable Income | [2]56,421 |

[1]We note that 98,780 x .669 yields a result of 66,083.82, not 66,105.

[2]After factoring in respondent's previously mentioned mathematical error, the actual increase in taxable income would be $56,442.18. Thus, respondent's mathematical error benefits petitioners.

B. Discussion

1. Allocation of Items

Petitioners' 1987, 1988, and 1990 tax returns overstated itemized deductions for home mortgage interest. Generally, this personal deduction item is allocated evenly between individuals. Sec. 6015(d)(3)(A); S. Rept. 105-174, supra at 57, 1998-3 C.B. at 593. Petitioner bears the burden of proving that a different allocation is appropriate. Sec. 6015(c)(2); S. Rept. 105-174, supra at 57, 1998-3 C.B. at 593.

During the years in issue, petitioners resided at Lots 22 and 27, Acorn Court, and the Albritton property. These residences and the corresponding mortgages were in the joint names of petitioner and Mr. Rowe. Petitioner testified that she was aware that the residences were jointly titled, and she knew that loans were acquired on these properties. Petitioner acknowledged signing the loan and deed documents for the

properties.  Under these circumstances, these items are allocable evenly between petitioner and Mr. Rowe.  Therefore, to the extent petitioner lacked actual knowledge of these items, she will qualify for relief from joint liability under section 6015(c) for the portion of the item allocable to Mr. Rowe.[17]

### 2.  Actual Knowledge

Respondent argues that petitioner had actual knowledge of the erroneous mortgage interest deductions.  In order to prove actual knowledge in the context of an erroneous deduction, respondent must show that petitioner had "actual knowledge of the factual circumstances which made the item unallowable as a deduction."  King v. Commissioner, 116 T.C. at 204.

### i.  1987 Mortgage Interest

Respondent disallowed $12,169 of the claimed mortgage interest deduction for 1987 on the basis of a lack of substantiation.  Thus, respondent must show that petitioner knew or believed that the mortgage interest for 1987 was overstated by $12,169.  See id.

Respondent claims that petitioner had actual knowledge of the existence and amount of the home mortgage interest payments in 1987 because she wrote the checks to pay the mortgage

---

[17]Because petitioner cannot qualify for relief under sec. 6015(c) for the portions of items which are allocable to her, we analyze her ability to qualify for relief for such portions in our later discussion under sec. 6015(b) and (f).  See infra pp. 53-61.

interest.  Petitioner agrees that she knew of the mortgage; however, she claims that she was unaware of the amount of interest paid or that it was incorrectly reported on the tax return.

The evidence in the record demonstrates that petitioner wrote the checks for the mortgage payments in 1987 and 1988. However, there is no evidence that petitioner knew what portion of the payments for 1987 constituted interest or the total amount of interest paid in that year.  The testimony of both petitioner and Mr. Rowe indicates that petitioner was given only the first two pages of the tax return when signing the return and she was not afforded the opportunity to see or review any attachments, schedules, or other documents pertaining to the return. Therefore, respondent has failed to show that petitioner knew or believed that the 1987 mortgage interest was overstated. Accordingly, we hold that petitioner is entitled to relief from joint liability under section 6015(c) for the portion of this item allocable to Mr. Rowe.

ii.  1988 Mortgage Interest

Petitioners claimed a home mortgage interest deduction of $97,341 in 1988.  Petitioners substantiated $84,186 of the amount claimed for the home mortgage interest deduction.  The notice of deficiency for 1987, 1988, and 1989, provided the following

explanation for disallowing the remaining $13,155 claimed as deductible home mortgage interest:

> It is determined that $13,155 of home mortgage interest expense claimed on Schedule A in the 1988 tax year is disallowed because this amount relates to one of your rental properties and has already been deducted on Schedule E. Thus, this mortgage interest must be disallowed from Schedule A to prevent it from being deducted twice.

> Accordingly, your taxable income for the 1988 tax year is increased by $13,155.

Thus, in order to establish actual knowledge, respondent must show that petitioner knew or believed that $13,155 of the claimed mortgage interest was unallowable because it was already listed on Schedule E.

Respondent claims that petitioner had actual knowledge of the existence and the amount of the home mortgage interest payments in 1988 because she also wrote the checks to pay the mortgage interest for that year. Petitioner agrees that she knew of the mortgage; however, she claims that she was unaware of the amount of interest paid or that it was incorrectly reported on the tax return. Petitioner testified that she received the first two pages only of the tax return and that she did not see any attached schedules or other documentation. Respondent failed to present evidence showing that petitioner had actual knowledge that the 1988 mortgage interest was overstated because the $13,155 had already been listed as a rental expense on Schedule E. Therefore, we find that petitioner did not have actual

knowledge of the factual circumstances which made $13,155 unallowable as a Schedule A itemized deduction. Accordingly, we hold that petitioner is entitled to relief from joint liability under section 6015(c) for the portion of this item allocable to Mr. Rowe.

### iii. 1990 Mortgage Interest

Petitioners claimed a home mortgage interest deduction of $122,526 in 1990. Respondent determined that petitioners' allowable interest expenses was $98,780 but that 33.1 percent of this amount should have been reported on Schedule F.[18] On the basis of this determination, respondent allowed a mortgage interest deduction of $66,105 and disallowed $56,421.[19] Thus, in order to establish actual knowledge, respondent must show that

---

[18]The notice of deficiency provides no explanation as to how this allocation was determined or why 33.1 percent of the allowable interest expense should have been reported on Schedule F. At trial, Robert Bamber (Mr. Bamber), the revenue agent assigned to the examination of petitioners' 1990 tax return, testified that he examined the interest expense claimed on Schedule F, $60,564, and the mortgage interest deduction claimed on Schedule A, $122,526, and calculated the proportion claimed on each Schedule in relation to the overall interest amount claimed, $183,090. On the basis of information reported by other sources, Mr. Bamber determined that petitioners' allowable interest related deduction was $98,780, and he allocated this amount between the Schedule A and the Schedule F in the same proportion as the amounts claimed on the 1990 return. Consequently, respondent limited petitioners' Schedule A mortgage interest deduction to $66,105.

[19]As previously mentioned, the notice of deficiency contains a mathematical error which benefits petitioners by approximately $21. For purposes of this issue, we shall use the amounts determined by respondent in the notice of deficiency.

petitioner knew or believed that petitioners' home mortgage interest was limited to $66,105.

Respondent's sole contention is that because petitioner had actual knowledge of the amount of interest payments in 1987 and 1988, petitioner also had actual knowledge of the amount of interest paid on the mortgage in 1990. Petitioner agrees that she knew of the mortgages; however, she claims that she was unaware of the amount of interest paid or that it was incorrectly reported on the tax returns. Petitioner claims that the interest payments for 1990 were deducted on Schedule A as home mortgage interest and on Schedule F as farm interest expense. Petitioner contends that she did not know how much interest was paid on the mortgage, and, because she was allowed to review the first two pages only of the 1990 return and not the corresponding schedules, she was unaware that the interest payments were deducted twice.

No evidence was presented establishing what funds were used to make the mortgage interest payments in 1990. Our review of the bank statements for 1990 for the NCNB account reveals that the opening balance was approximately $1,855 and that deposits totaling only approximately $7,086 were made during that year. Thus, it appears that little, if any, funds were used from the

NCNB account to make the mortgage interest payments in 1990.[20] As we mentioned earlier, the record indicates that petitioner saw the first two pages only of the tax returns, and she was not afforded the opportunity to see or review any attachments, schedules, or other documents pertaining to the returns.  Thus, petitioner would not have known that a portion of the interest payments was deducted as both a Schedule A itemized deduction and a Schedule F interest expense.  Respondent has not established that petitioner had actual knowledge of the factual circumstances which limited the 1990 Schedule A mortgage interest to $66,105. Accordingly, we hold petitioner is entitled to relief from joint liability under section 6015(c) for the portion of this item allocable to Mr. Rowe.

## IV.  Farming Activity Losses

### A.  Background

During the years in issue, Mr. Rowe owned and showed horses. Petitioner had little or no involvement in this horse activity. In 1987, Mr. Rowe employed Joseph and Patricia Shortino (the Shortinos) as horse trainers, and they showed and stabled Mr. Rowe's horses during the years in issue.[21]  The Shortinos had

---

[20]We note that Mr. Rowe testified that at some point during the years in issue he took over the responsibility of making the mortgage payments.

[21]Mr. Rowe first met Joseph and Patricia Shortino (the Shortinos) in 1985, and they became personal friends of
(continued...)

been in the horse business since 1979, and they operated an S

corporation called Showcase Farm, Inc.  Mr. Rowe purchased a

horse trailer for the Shortinos to use in connection with the

horse activity.  Mr. Rowe and petitioners' son, Christopher, also

participated in showing horses during the years in issue.  For

the years in issue, the income and expenses of the

horse activity were reported on a Schedule F attached to

petitioners' tax returns.

At some point in time during the years in issue, Mr. Rowe

became involved in raising fish.  The income and expenses for the

horse and fish activities (collectively, farming activity) were

combined for tax reporting purposes.  Petitioner was not involved

in the fish activity.

For the years in issue, the following losses from the

farming activity were reported on the Schedules F:

| Year | Loss Amount |
|------|-------------|
| 1987 | $143,650 |
| 1988 | 117,278 |
| 1989 | 139,448 |
| 1990 | 184,221 |

For the taxable years 1987, 1988, and 1989, petitioner and Mr.

Rowe were listed on the Schedules F as the proprietors of the

farming activity.  For the taxable year 1990, Mr. Rowe alone was

[21](...continued)
petitioners.

listed on the Schedule F as the proprietor of the farming activity.

B. Discussion

1. Allocation of Item

Petitioner argues that the farming activity is allocable to Mr. Rowe because petitioner had little or no involvement in either the horse activity or the fish activity. However, respondent contends that the farming activity is still allocable evenly between petitioner and Mr. Rowe. Respondent relies on the fact that petitioner's name is listed on the tax returns for 1987, 1988, and 1989 as a proprietor of the farming activity to support his contention. Additionally, respondent argues that the horse activity was a family affair that petitioner participated in by attending different events.

Petitioner testified that she watched Christopher participate in horse shows "less than half a dozen times" during the years in issue. Contrary to respondent's argument, petitioner testified that only Christopher was involved in showing horses during the years in issue and that Elizabeth did not become involved until later. Mr. Shortino corroborated petitioner on this point, testifying that Elizabeth did not begin showing horses until sometime around 1992. Petitioner claims she did not know the extent of the horse activity, played no role in the decision to acquire the farm property, and only saw the

horses in the possession of the Shortinos. Christopher testified that petitioner was not involved in the horse activity and that she did not make any decisions relating to the activity.

Mr. Rowe testified that he made the original decision to start the horse activity and that he did not discuss it with petitioner. Mr. Rowe considered the activity principally his, and he included his children in the activity. Mr. Rowe testified that he made all decisions regarding the horse activity and told petitioner nothing about the horse activity. Additionally, Mr. Rowe testified that he did not consult petitioner before starting the fish activity, and he did not believe she wrote any checks in connection with the fish farm. With respect to the fact that petitioner's name was listed as a proprietor on the 1987, 1988, and 1989 tax returns, Mr. Rowe testified that the 1987 and 1988 returns were filled out by another individual and he simply signed them without reviewing their contents. As we have mentioned previously, the record indicates that petitioner was given the first two pages only of the tax returns when signing the returns, and she was not afforded the opportunity to see or review any attachments, schedules, or other documents pertaining to the returns.

The Shortinos testified that the checks they received for their services as horse trainers while employed by Mr. Rowe always came from him and never from petitioner. Our review of

the checks written on petitioners' joint account during the years in issue confirms that petitioner's signature does not appear on any of the checks written to Showcase Farms, Inc., the Shortinos' S corporation.[22]  The Shortinos also testified that they consulted only with Mr. Rowe regarding the horses.  Mr. Shortino testified that he never saw petitioner's name listed as an owner of any of the horses and that petitioner was not involved in the activity.  Mr. Shortino testified that petitioner did not know Mr. Rowe had purchased the horse trailer, and Mrs. Shortino testified that Mr. Rowe specifically told her not to tell petitioner about the horse trailer.

The evidence in the record reflects that petitioner's involvement in the farming activity during the years in issue was minimal and purely social in nature.  Other than infrequent attendance at horse shows to support her son, petitioner's only apparent link to the activity is that her name is listed as a proprietor on the 1987, 1988, and 1989 tax returns.  In this regard, the evidence reflects that petitioner was unaware she was

---

[22]No checks from petitioners' joint account were written to either Joseph Shortino or Patricia Shortino.  Only Mr. Rowe's signature is listed on various checks payable to Showcase Farms, Inc., dated during the years in issue.  Additionally, only Mr. Rowe's signature is listed on two other checks with memo notations of "Horse show" and "Stable".  Our review of all the checks written on petitioners' joint account reveals that petitioner's signature is not listed on any checks which, on the basis of the payee and the memo notation, indicate payment in connection with any horse or fish activity.

listed as a proprietor, and we decline to allocate any portion of this item to her simply because her name was listed as such on the tax returns. See, e.g., <u>Bokum v. Commissioner</u>, 94 T.C. 126, 140-141 (1990), affd. 992 F.2d 1132 (11th Cir. 1993); <u>Buchine v. Commissioner</u>, T.C. Memo. 1992-36, affd. 20 F.3d 173 (5th Cir. 1994). Accordingly, this item is allocable to Mr. Rowe. Consequently, petitioner will be entitled to complete relief from joint liability under section 6015(c) unless respondent can show that petitioner had actual knowledge of this item.

### 2. Actual Knowledge

In the notice of deficiency for the years 1987, 1988, and 1989, respondent determined that petitioners were not entitled to the claimed Schedule F losses because the farming activity was not engaged in for profit. In the notice of deficiency for 1990, respondent determined that petitioners were not entitled to the claimed Schedule F loss because it had not been established that the farming activity was engaged in as a trade or business within the meaning of section 162 or as a means of holding property for the production of income within the meaning of section 212. Respondent's primary position under section 6015(c)(3)(C) is that petitioner had actual knowledge that Mr. Rowe was not engaged in the farming activity for profit.[23] In order to prove actual

---

[23]As an alternative ground for disallowing the Schedule F losses, respondent determined that petitioners failed to
(continued...)

knowledge, respondent must show that petitioner had "actual knowledge of the factual circumstances which made the item unallowable as a deduction." King v. Commissioner, 116 T.C. at 204. In the instant case, this requires that respondent prove that petitioner knew or believed that Mr. Rowe was not engaged in the farming activity for profit. See King v. Commissioner, supra at 205.

Section 183 provides that expenses incurred in conducting an activity which is "not engaged in for profit" are not deductible, except as otherwise provided in section 183(b). Section 183(c) defines an activity not engaged in for profit as "any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212." This case is appealable to the Court of Appeals for the Eleventh Circuit. In determining whether an activity is engaged in for profit, the Court of Appeals for the Eleventh Circuit has stated that the relevant inquiry is whether the taxpayer's actual and honest objective in engaging in the activity is to make a profit. Osteen v. Commissioner, 62 F.3d

---

[23](...continued)
substantiate the claimed losses. On brief, respondent limits his sec. 6015(c) argument to the contention that petitioner had actual knowledge that the horse and fish activities were not engaged in for profit. While respondent asserts that petitioners have failed to prove that the losses were actually incurred, respondent has not proven that the losses were not incurred and makes no allegation that petitioner had actual knowledge that such losses were not incurred.

356, 358 (11th Cir. 1995), affg. in part and revg. in part T.C. Memo. 1993-519; <u>Zarins v. Commissioner</u>, T.C. Memo. 2001-68. While a reasonable expectation of profit is not required, the objective facts and circumstances must indicate that the taxpayer's intent was to make a profit. <u>Osteen v. Commissioner</u>, <u>supra</u> at 358. Whether a taxpayer is engaged in an activity for profit is a question of fact to be resolved from all relevant facts and circumstances. <u>Hulter v. Commissioner</u>, 91 T.C. 371, 393 (1988). In resolving this factual question, greater weight is given to objective facts than to the taxpayer's mere statement of his intent. <u>Siegel v. Commissioner</u>, 78 T.C. 659, 699 (1982); sec. 1.183-2(a), Income Tax Regs.

The regulations under section 183 contain a nonexclusive list of nine objective factors to be taken into account when deciding whether an activity is engaged in for profit. These factors are: (1) The manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisers; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) the

- 46 -

elements of personal pleasure or recreation involved.  Sec.
1.183-2(b), Income Tax Regs.  No single factor is controlling.
Osteen v. Commissioner, supra at 358; Brannen v. Commissioner,
722 F.2d 695, 704 (11th Cir. 1984), affg. 78 T.C. 471 (1982);
sec. 1.183-2(b), Income Tax Regs.  The factors are relevant in
the context of this case to the extent they may indicate whether
petitioner knew or believed that Mr. Rowe was or was not engaged
in the farming activity for profit.  See King v. Commissioner,
supra at 205.

Respondent argues that petitioner knew that the farming
activity was not engaged in for profit.  Respondent bases his
argument on petitioner's testimony that the horse activity was a
fun thing for Mr. Rowe to do with his son on the weekends and
that petitioner did not consider the activity an "operation" but
rather her husband just "had a couple of horses in Tampa".
Respondent contends that petitioner understood that the horse
activity was a fun family recreational activity, and this
understanding establishes that she had actual knowledge that the
horse activity was not engaged in for profit.  Additionally,
respondent claims that petitioner had actual knowledge of both
the horse and fish activities, as well as actual knowledge of the
claimed Schedule F losses.

As we noted earlier, petitioner had little or no involvement
in the farming activity.  Additionally, she testified that she

saw the first two pages only of the tax returns; thus, she was not afforded the opportunity to review the Schedules F listing the income and expenses attributable to the farming activity. Petitioner also testified that she trusted Mr. Rowe when she signed the tax returns because he told her the returns were correct, and he assured her he had appropriate records.[24]

The evidence in the record indicates that Mr. Rowe controlled all aspects of the farming activity, and he conducted the activity without any assistance from petitioner. He testified that he did not consult with petitioner before making decisions concerning the farming activity, and he did not provide her with any information about the activity. In fact, Mr. Rowe testified that he felt that he was operating the horse activity as a business. He also testified that he started the fish activity in order to make the farming activity a more viable business. The testimony of Mr. Danley and the Shortinos, as well as the testimony and affidavit of Mr. Murray, all indicates that Mr. Rowe acted as if he was engaged in the farming activity for profit. There is no evidence that Mr. Rowe acted in such a manner that would cause petitioner to know or believe that Mr. Rowe was not engaged in the farming activity for profit.

---

[24]Petitioner testified that she did not know whether parentheses around a number on a tax return indicated a loss or a profit.

- 48 -

Respondent has failed to establish that petitioner knew or believed that her former spouse was not engaged in the farming for profit.  Accordingly, we hold petitioner is entitled to relief under section 6015(c) from the tax liability arising out of this activity.

V.   Charitable Contributions

A.   Background

On their 1987 return, petitioners claimed a charitable contribution deduction of $5,556.  Of this amount, $4,059 was listed as contributed to "1st United Methodist".  In 1987, petitioner wrote five checks to the St. Cloud First United Methodist Church on the NCNB account totaling $5,500.  Respondent allowed the $5,556 charitable contribution deduction claimed on the 1987 return.

On their 1988 return, petitioners claimed a charitable contribution deduction of $8,165.  On the attached Schedule A, the claimed contribution was identified as "ERS-106, 1st United Meth. 8,059".  Respondent disallowed the entire amount claimed as a charitable contribution deduction for 1988 on the ground that petitioners had failed to substantiate the charitable contribution.  In 1988, neither petitioner nor Mr. Rowe wrote any checks on the NCNB account to the St. Cloud First United Methodist Church.

On their 1989 return, petitioners claimed a charitable contribution deduction of $8,111. The Schedule A attached to the return did not identify any organization to which a contribution was made. Respondent disallowed the entire amount claimed as charitable contribution deduction for 1989 on the ground that petitioners had failed to substantiate the charitable contribution. No evidence was presented establishing whether any checks were written on the NCNB account to the St. Cloud First United Methodist Church in 1989.

B. Discussion

1. Allocation of Items

Petitioner claims that this item is allocable to Mr. Rowe because he controlled the amount contributed to the church and he represented to her that the contributions had been made. Respondent argues that this item should be allocated evenly between petitioner and Mr. Rowe because the contributions were to a church which they both attended and in which petitioner was actively involved.

Congress intended for personal deduction items to generally be allocated equally between spouses, unless the electing spouse establishes that a different allocation is appropriate. Sec. 6015(c)(2); S. Rept. 105-174, supra at 57, 1998-3 C.B. at 593.[25]

---

[25]The legislative history of sec. 6015 provides the following example of an allocation of charitable contributions:
(continued...)

Petitioner testified that she regularly attended the St. Cloud First United Methodist Church during the years in issue and that she was very involved in church activities. Petitioner testified that she and Mr. Rowe had tithed regularly during their entire married life. In 1987, petitioner wrote five checks totaling $5,500 to the church on the NCNB account, and respondent allowed the $5,556 charitable contribution deduction claimed on the 1987 return. The Schedule A attached to the 1988 return indicates that most, if not all, of the claimed contribution deduction related to the church. The Schedule A attached to the 1989 return does not indicate whether the claimed deduction related to the church; however, petitioner's testimony indicates that she believed that the claimed deduction for 1989 also related to the church that she regularly attended and was very active in. In the instant case, petitioner has failed to show that it is appropriate to allocate the charitable contribution items for 1988 and 1989 other than equally between her and Mr. Rowe.

---

[25](...continued)
Personal deduction items are expected to be allocated equally between spouses, unless the evidence shows that a different allocation is appropriate. For example, a charitable contribution normally would be allocated equally to both spouses. However, if the wife provides evidence that the deduction relates to the contribution of an asset that was the sole property of the husband, any deficiency assessed because it is later determined that the value of the property was overstated would be allocated to the husband. [S. Rept. 105-174, at 57 (1998), 1998-3 C.B. 537, 593.]

Therefore, to the extent petitioner lacked actual knowledge of these items, she will qualify for relief from joint liability under section 6015(c) for the portion of the item allocable to Mr. Rowe.[26]

### 2. Actual Knowledge

Respondent argues that petitioner had actual knowledge that the charitable contributions were not made in 1988 and 1989. In order to prove actual knowledge, respondent must show that petitioner had "actual knowledge of the factual circumstances which made the item unallowable as a deduction." King v. Commissioner, 116 T.C. at 204. In the instant case, respondent disallowed the charitable contribution deductions because petitioners failed to substantiate the claimed deductions. Thus, the relevant inquiry is whether petitioner knew or believed that charitable contributions in the amounts reported on petitioners' 1988 and 1989 tax returns were not made.

In the instant case, Mr. Rowe was in charge of petitioners' financial and business affairs. Petitioner testified that the amount petitioners' tithed to the church was Mr. Rowe's decision. Petitioner further testified that she was "told when to write checks to the church", and she wrote checks only when directed to

_____

[26]Because petitioner cannot qualify for relief under sec. 6015(c) for the portions of items which are allocable to her, we analyze her ability to qualify for relief for such portions in our later discussion under sec. 6015(b) and (f). See infra pp. 53-61.

by Mr. Rowe.  Petitioner credibly testified that she was not surprised by the amounts of charitable contributions deductions claimed in 1988 and 1989, and she believed that contributions were made during those years.

Respondent maintains that if only petitioner wrote checks to the church from the joint account in 1987, then the fact that no checks were written to the church from the joint account in 1988 demonstrates that petitioner had actual knowledge that no contributions were made in either 1988 or 1989.[27]  However, petitioner testified that, beginning in 1988, her role in paying bills and writing checks diminished because Mr. Rowe began to take over those duties.  Mr. Rowe corroborated this point by testifying that at some point during the years in issue he took over the responsibility of paying certain bills, such as mortgage payments, car payments, and credit card payments.  Mr. Rowe further testified that he had various other accounts which he used to transfer money and that petitioner did not have knowledge of these accounts.

The fact that no checks were written on petitioners' joint account in 1988 does not establish that petitioner had actual knowledge that no contributions were made to the church in either 1988 and 1989.  Mr. Rowe testified that he did not know whether

[27]As previously mentioned, no evidence was presented establishing whether any checks were written on the NCNB account to the St. Cloud First United Methodist Church in 1989.

he provided petitioner with any information regarding charitable contributions. In the instant case, petitioner had no reason to believe that Mr. Rowe had not contributed to the church in 1988 and 1989 in the same manner as petitioners contributed in prior years. Under the circumstances presented in this case, respondent has failed to show that petitioner had actual knowledge that the charitable contributions were not made in 1988 and 1989. Accordingly, we hold that petitioner is entitled to relief from joint liability under section 6015(c) for the portion of this item allocable to Mr. Rowe.

VI. Application of Section 6015(b)

Petitioner claims that she is entitled to complete relief from liability under section 6015(b) with respect to the items giving rise to the deficiency. One requirement of section 6015(b) is that the understatement of tax be attributable to erroneous items of the nonelecting spouse. Sec. 6015(b)(1)(B). We previously granted petitioner complete relief under section 6015(c) for the IRA distributions and farming activity losses. We also granted petitioner partial relief under section 6015(c) for the half of the capital gains, mortgage interest, and charitable contributions items which we found are allocable to Mr. Rowe. Thus, the only items remaining are the half of the capital gains, mortgage interest, and charitable contributions which are allocable to petitioner. Consequently, petitioner is

not entitled to relief under section 6015(b) for the capital gains, mortgage interest, and charitable contributions which are allocable to her because these are not erroneous items "of" Mr. Rowe.

## VII. Application of Section 6015(f)

Petitioner claims that, to the extent she fails to qualify for relief under section 6015(b) or (c), she is entitled to equitable relief under section 6015(f). We previously found that the capital gains, mortgage interest, and charitable contributions items are allocable evenly between petitioner and Mr. Rowe for purposes of section 6015(c). We also held that petitioner did not have actual knowledge of any of these items, and, thus, she is entitled to relief under section 6015(c) for the portions of the items allocable to Mr. Rowe. Thus, the question is whether petitioner is entitled to equitable relief under section 6015(f) for the portion of the capital gains, mortgage interest, and charitable contributions items giving rise to deficiencies which are allocable to her.

Petitioner's claim for relief from joint liability was initiated in her amended petition to this Court. Before trial, respondent conceded that petitioner was entitled to relief with respect to certain items contained in the notices of deficiency. We must presume that "before doing so, respondent followed standard procedures by reviewing his administrative files and

considered petitioner's contentions."  Cheshire v. Commissioner,
115 T.C. at 198.  Respondent argues that, considering all facts
and circumstances, the determination that petitioner was not
entitled to equitable relief is consistent with Rev. Proc. 2000-
15, 2000-5 I.R.B. 447, the Internal Revenue Service's published
guidelines on when equitable relief should be granted.

We have previously found that petitioner did not have actual
knowledge under section 6015(c) of the items giving rise to the
deficiency.  The evidence also reflects that petitioner's
involvement with the Federal income tax returns and corresponding
audits was minimal.  Mr. Rowe regularly prepared petitioners'
joint tax returns, and he testified that petitioner had no role
in providing information for the returns.  Petitioner testified
that Mr. Rowe provided her with only the first two pages of the
returns, assured her he had records for the returns, and she
trusted him when he said the returns were correct.  Mr. Danley,
the accountant who assisted with the preparation of petitioners'
1990 return, testified that he never discussed the 1990 return
with petitioner, she did not provide him with any information,
and she did not have any involvement in the preparation of that
return.

Petitioner also testified that she was unaware of the audits
of petitioners' taxable years 1987 through 1990 until late 1995
and that she never received any correspondence from the Internal

Revenue Service. Mr. Rowe could not remember who received the notices of deficiency, and he could not remember discussing or giving petitioner copies of them. However, Mr. Rowe testified that he, not petitioner, would have opened up any correspondence from the Internal Revenue Service. Mr. Danley testified that when petitioners where audited, he never spoke to petitioner about the audit. At trial, the revenue agent assigned to the examination of petitioners' 1987, 1988, and 1989 tax returns, testified that he did not talk with petitioner during the examination. Moreover, he did not recognize petitioner in the courtroom at trial.[28] The revenue agent assigned to the examination of petitioners' 1990 tax return testified that he had never met petitioner.[29]

Petitioner testified that she did not sign the tax returns under duress. However, petitioner did testify that Mr. Rowe

_____

[28]The revenue agent originally testified that he had met petitioner when he issued a summons because he personally went to petitioners' home and gave copies of the notice to the woman who answered the door. However, the revenue agent then testified that he had assumed petitioner was the woman who answered the door but that petitioner was presently "not the least bit familiar to me".

[29]There is other evidence in the record to support petitioner's claims that Mr. Rowe did not keep her informed about their financial affairs. For example, petitioner and John Albers, the police officer who arrested Mr. Rowe in 1989 in connection with the embezzlement charges related to Mr. Rowe's employment at the Central Florida Dental Association, both testified that petitioner was not aware that Mr. Rowe was arrested for embezzlement until she read about it in the newspaper.

would get "verbally ugly" if she questioned him about business documents and that she was only provided with information when Mr. Rowe wanted her to know. Christopher testified that there were several arguments between petitioner and Mr. Rowe, and they usually centered around the discussion of financial matters. Christopher further testified that when petitioner asked Mr. Rowe questions concerning financial matters, Mr. Rowe would either ignore her and leave or become angry and tell her it was none of her business.

The record also reflects that petitioner will suffer economic hardship if relief is not granted. In 1995, Mr. Rowe was convicted of Federal money laundering. He was sentenced to 33 months in prison and ordered to make restitution to the Bank of New York in the amount of $359,452.17.[30] Petitioner testified that in 1995 she moved from Florida back to Kingsport, Tennessee, to live with her parents because she was destitute and had no funds to provide a home for herself. Petitioner and Mr. Rowe's divorce was finalized in June 1996. The final judgment for Dissolution of Marriage between petitioner and Mr. Rowe states that petitioner's "standard of living and financial circumstances have been devastated by * * * [Mr. Rowe's] wrong-doing and

---

[30]Mr. Rowe was subsequently convicted in 1997 of 51 counts of unlawful compensation under Florida State Medicaid laws and one count of organized fraud. He was sentenced to 8 months in prison and ordered to make restitution of $5,051.45 to the Department of Health and Human Services in the amount.

incarceration."  The Final Judgment also notes that petitioner "does not have the present financial resources to support herself and * * * [petitioners' daughter, Elizabeth] adequately, but that * * * [Mr. Rowe] does not have the present ability to pay alimony."[31]  On the basis of the factual circumstances present, Mr. Rowe was ordered to pay petitioner $1 of permanent alimony per year, although the court reserved jurisdiction to modify the amount upon Mr. Rowe's release from incarceration and re-entry into the job market.

Petitioner testified that after the divorce there was very little money left in a college fund to pay for Elizabeth's undergraduate education.  Petitioner testified that she and Elizabeth had to supplement the fund with student loans and whatever money petitioner could contribute from her own income. At the time of trial, petitioner was employed full time as a dental hygienist, and she was paid by commission only.

Finally, the evidence in the record demonstrates that petitioner has not significantly benefited, either during or after her marriage, from the items giving rise to the deficiencies.  Petitioner did not have expensive jewelry, drive a luxurious car, or wear designer clothes.  In fact, petitioner testified that she generally made clothes for herself and her

---

[31]The final judgement also found that petitioner did not have the financial ability to accept collect calls from Mr. Rowe.

daughter. Mr. Rowe testified that petitioner did not expend money lavishly. Petitioner testified that the only trip the family went on contemporaneous to the years in issue was a 1986 trip to Hawaii, and the testimony indicates that the trip was inexpensive and not lavish.[32]

Although the purchase price of the Albritton property and construction of a residence at that location exceeded $1 million, the inside of the residence was sparsely furnished with old office furniture from Mr. Rowe's business, and the walls were decorated with arts and crafts which were handmade by petitioner. As a result of Mr. Rowe's criminal activities, petitioner had to move out of the Albritton residence and back to Kingsport, Tennessee, to live with her parents because she was destitute and had no funds to provide a home for herself.[33]

Despite the fact that Mr. Rowe was earning substantial amounts of income during the years in issue, in 1989 and 1990 only $26,176 and $7,086,[34] respectively, were deposited into the

---

[32]Joseph Shirah, who accompanied petitioners on the Hawaii trip, testified that the plane tickets for the trip were at a discount rate and "it was a very inexpensive trip."

[33]Respondent determined that petitioners had unreported income of $283,928, $29,924, $94,648, and $82,053, respectively for the years 1987 through 1990. This unreported income was attributable solely to Mr. Rowe, and respondent concedes that petitioner is not liable for any deficiency associated with this unreported income for the years in issue.

[34]Of this deposit total, approximately $4,102, represented
(continued...)

NCNB account, which petitioner testified was the only account she used during the years in issue. Mr. Rowe testified that he put almost all the money he earned back into his dental business and horse activity. Presumably, Mr. Rowe was also depositing most of his earnings into his separate accounts which petitioner was unaware existed. In his deposition, Mr. Shirah stated that Mr. Rowe purchased a house in the name of Mr. Shirah's business for another woman.[35] Mr. Shirah stated that Mr. Rowe was involved with the other woman during his marriage to petitioner. At trial, Mr. Rowe admitted becoming involved with the other woman in 1993. Petitioner testified that the reason she filed for divorce was because Mr. Rowe was involved with the other woman while he was still married to petitioner.[36]

On the basis of all the facts and circumstances of this case, we find that compelling reasons existed for respondent to grant petitioner equitable relief. Consequently, we hold that respondent abused his discretion in denying petitioner's claim for relief under section 6015(f) for the portion of the capital

---

[34](...continued)
petitioner's earnings from her employment as a substitute teacher.

[35]Mr. Shirah stated that Mr. Rowe signed the realty contract and the mortgage on the house. However, Mr. Shirah stated that Mr. Rowe had no connection to Mr. Shirah's business.

[36]At trial, Mr. Rowe testified that he married the other woman after he and petitioner were divorced.

gains, mortgage interest, and charitable contributions items allocable to petitioner.

VIII.    Additions to Tax and Penalties

Respondent did not determine that the fraud additions to tax pursuant to section 6653(b) for the taxable years 1987 and 1988, and the fraud penalty pursuant to section 6663 for the taxable year 1989, were applicable to petitioner.  On brief, respondent concedes that to the extent any relief is granted for a portion of the deficiencies, relief is automatic for the penalties related to that portion.  Petitioner concedes that the estimated tax penalty pursuant to section 6654 for 1990 should be allocated proportionally to the allocation of the underlying deficiency. Petitioner contends that it is inequitable to hold her liable for any remaining additions to tax or penalties.

We have previously held that we have jurisdiction to review the denial of relief from joint liability under section 6015(f) for additions to tax and penalties.  Cheshire v. Commissioner, 115 T.C. at 197-199.  We review respondent's refusal to grant equitable relief for additions to tax or penalties under an abuse of discretion standard.  Id. at 198.  In Cheshire v. Commissioner, supra, we provided the following guidance in determining whether respondent has abused his discretion in denying equitable relief in situations involving additions to tax or penalties:

In our opinion, it is an abuse of discretion to deny relief under section 6015(f) in an addition to tax or penalty situation when on an individual basis the putative innocent spouse meets the statutory standard generally applied to all taxpayers that shows the addition to tax or penalty is inapplicable. [Id. at 199.]

A.    Addition to Tax for Failure To File Timely

Respondent determined that petitioners were liable for the addition to tax pursuant to section 6651(a)(1) for 1989.  Section 6651(a)(1) imposes an addition to tax for failure to file a required return on the date prescribed.  After factoring in the parties' concessions and our decisions in petitioner's favor, petitioner does not have an unpaid tax liability for 1989.  In light of respondent's concession, petitioner is not liable for the addition to tax for 1989.

B.    Substantial Understatement Penalty

For the taxable years 1987 and 1988, respondent determined that petitioners were liable for the substantial understatement penalty pursuant to section 6661.  However, after taking into account respondent's concessions and the issues decided in petitioner's favor, petitioner's sole remaining liability for those years involves an $85 theft loss adjustment in 1987 which the parties agree is allocable one-half to petitioner.[37]  With the minimal theft loss adjustment remaining as the only issue for petitioner for 1987, the predicate for the substantial

------

[37]See appendix.

understatement penalty no longer exists.  Accordingly, we hold that petitioner is not liable for this penalty for either taxable year.

C.    Accuracy-Related Penalty

Finally, respondent determined that petitioner was liable for the accuracy-related penalty pursuant to section 6662(a) for 1990 for negligence.  Section 6662(a) imposes a penalty equal to 20 percent of the portion of an underpayment of tax attributable to a taxpayer's negligence, disregard of rules or regulations, or substantial understatement of income tax.  Sec. 6662(a), (b)(1) and (2).  "Negligence" has been defined as the failure to do what a reasonable and ordinarily prudent person would do under the circumstances.  Neely v. Commissioner, 85 T.C. 934, 947 (1985). However, section 6662(a) does not apply to "any portion of an underpayment if it is shown that there was a reasonable cause for such portion and that the taxpayer acted in good faith with respect to such portion."  Sec. 6664(c)(1).  The Commissioner's determination that a taxpayer was negligent is presumptively correct, and the burden is on the taxpayer to show a lack of negligence.  Hall v. Commissioner, 729 F.2d 632, 635 (9th Cir. 1984), affg. T.C. Memo. 1982-337.

After factoring in the parties' concessions and our decisions in petitioner's favor, petitioner's tax liability for 1990 stems from $6,253 of omitted W-2, Wage and Tax Statement,

- 64 -

income and $48.50 of omitted interest income.  In Cheshire v.
Commissioner, supra, we faced a similar situation wherein the
spouse claiming relief from joint liability relied upon her
husband for the accurate preparation of their income tax return.
In that case, we stated:

>     Petitioner trusted and relied upon Mr. Cheshire
> when it came to the preparation of their tax returns.
> She is an elementary school teacher, having taken no
> courses in accounting or tax return preparation.  She
> asked Mr. Cheshire about the potential tax
> ramifications of the retirement distributions, and Mr.
> Cheshire assured petitioner that he had consulted with
> a certified public accountant and had been advised that
> the payment of the outstanding mortgage on the family
> residence and any amount rolled over into a qualified
> account reduced the taxable amount of the retirement
> distributions.  Mrs. Cheshire had no reason to doubt
> the truthfulness of Mr. Cheshire's statement, and in
> fact believed him.  Under these circumstances, we do
> not believe petitioner had an obligation to inquire
> further.  [Id. at 199.]

Petitioner has no background in accounting, tax, or other
financial matters, and she was primarily a housewife during her
marriage to Mr. Rowe.  Like the spouse claiming relief in
Cheshire v. Commissioner, supra, petitioner trusted and relied
upon her husband when it came to the preparation of their 1990
tax return, and she believed him when he told her the tax return
was correct.  For 1990, respondent determined that petitioners
failed to report $4,847 of interest income from various sources.
The amount of $97 related to petitioners' NCNB account.  The
parties stipulated that petitioner is entitled to relief from
joint liability under section 6015(c) for all but $48.50 of the

interest income. For 1990, petitioners reported business income of $297,756. Petitioner testified that she believed that her wage income for 1990 was grouped in with the business income reported on the return. Petitioner further testified that she believed the return was correct because it was prepared and signed by petitioners' accountant, Mr. Danley.

We find that petitioner had reasonable cause for the understatement caused by the omitted wage income and omitted interest income. Furthermore, we believe petitioner acted in good faith in erroneously concluding that the wage income and interest income was included in the 1990 return. Given the extreme facts and circumstances of this case, we believe that respondent abused his discretion by failing to grant petitioner relief from joint liability for the accuracy-related penalty for 1990. Accordingly, we hold that petitioner is not liable for this penalty for 1990.

To reflect the foregoing,

Decisions will be entered under Rule 155.

Appendix

In stipulations of agreed issues, petitioner John A. Rowe
conceded the following deficiencies in income taxes, additions to
tax, and penalties:[38]

| Year | Deficiency | Additions to Tax and Penalties | | |
|---|---|---|---|---|
| | | Sec. 6653(b)(1)(A) | Sec. 6653(b)(1)(B) | Sec. 6661 |
| 1987 | $173,817 | $130,363 | [1] | $43,454 |
| | | Sec. 6653(b)(1) | Sec. 6661 | |
| 1988 | $ 53,937 | $40,453 | $13,484 | |
| | | Sec. 6651(a)(1) | Sec. 6663 | |
| 1989 | $ 73,279 | $13,792 | $54,959 | |
| | | Sec. 6654 | Sec. 6662(c) | |
| 1990 | $124,891 | $8,057 | $24,978 | |

[1]50 percent of the interest due on $173,817.

In a stipulation of settled issues, respondent and
petitioner Donna L. Rowe agreed to the following disposition of
certain issues:

Ms. Rowe conceded that she is not entitled to relief from
joint liability for an $85 theft loss adjustment in 1987 and a
$6,253 income adjustment in 1990.  Ms. Rowe also conceded that
she is not entitled to relief from joint liability for $48.50 of
interest income, still in dispute, which was part of a $4,847
adjustment in 1990.

Respondent conceded that Ms. Rowe is entitled to relief from
joint liability under section 6015(c) for a $6,282 rental income

---

[38]Petitioner John A. Rowe's concessions encompass all the
determinations made by respondent in the notices of deficiency.

adjustment in 1990 and for $112,979 of the $116,405 lump-sum distributions adjustment in 1990.

In the stipulation of facts and first supplemental stipulation of facts, the following concessions were made:

Respondent conceded that, pursuant to section 6015(c), Ms. Rowe is not liable for any deficiency associated with unreported income of $283,928, $29,924, $94,648, and $82,053, respectively for the years 1987 through 1990. Respondent conceded that Ms. Rowe is entitled to relief from joint liability under section 6015(c) for 1990 with respect to the following adjustments: (1) Capital gain income of $11,919; (2) Schedule C income of $82,053; and (3) all but $48.50 of interest income which was part of a $4,847 adjustment.